## Waterhouse's Estate.

The facts appear from the adjudication of

LAMORELLE, P. J., Auditing Judge.—Archibald N. Waterhouse, who died November 7, 1902, gave the residue of his estate in trust to pay the net income during the lifetime of his wife, Bessie V. Waterhouse, two-thirds to her, with the proviso that if his daughter, Ethel, should at any time leave her religious life and cease to be a nun and enter again into the secular life, which she did on August 5, 1905, to pay over to her one-third of the net income, which was to be taken from the two-thirds directed to be paid to his wife, and to pay the

remaining one-third of the net income to his daughter, Charlotte E., and after the death of his said wife, and she died August 16, 1921, if his two daughters, Charlotte E. and Ethel, should then be both living, which was the case, then to pay over the net income to said daughters for life, with remainder over unnecessary to recite in that said two daughters are alive.

The account is of the awards made by adjudications upon the first and second accounts of the executors and items since received.

The account is filed for the purpose of determining the apportionment between principal and income of certain sums received from the sale of warrants, dividends and the proceeds of sale of certain stock.

Attached hereto and made part hereof, marked "A," is a copy of a letter from Ethel N. W. Brandon, one of the *cestuis que trustents*, in which she states, *inter alia*, that she agrees that the amount received from the sales of stock are to remain in the principal account, but that she would like the orphans' court to determine how much of the stock dividends and proceeds of sales of rights to subscribe to new stock shall be carried to principal and how much to income; also, a letter from Charlotte Ewing Jenkins, the other *cestui que trust*, to the same effect. This letter is marked "B," is hereto attached and made part hereof.

There is also attached hereto and made part hereof a stipulation of facts, marked "C;" an analysis of the account, marked "D;" deposition of Harold Malesardi, marked "E;" a statement of the balance sheets of the United States Mortgage and Trust Company, Chemical Bank and Trust Company, Guaranty Trust Company of New York, The Western National Bank of the United States and National Bank of Commerce in New York, marked "F;" a brief on behalf of Girard Trust Company, executor of the will of Bessie V. Waterhouse, deceased, marked "G;" and a brief on behalf of the accountant, marked "H."

It appears from these papers that testator owned at the time of his death 500 shares of the common stock of the Cambria Steel Company; that on December 31, 1902, the nearest available date to the date of the death of testator, said stock had a book value of $54.202 per share; that on September 24, 1913, the trustee sold 200 shares of said stock for the sum of $10,175; that the book value of these shares at the time of testator's death was $10,840.40, so that they were sold for $665.40 less than the book value; that on September 2, 1915, the trustee sold the remaining 300 shares, receiving therefor $16,309.50; that the book value of these shares at the time of the death was $16,260.60, so that they were sold at an increase of $48.90 over the book value at that time, and that the increase of $48.90 was due to accumulations of earnings which were included in the sale price received by the trustee.

It is contended by counsel for the widow that said sum of $48.90 should be treated as income, and by counsel for the accountant that the said sum should be applied to reduce the loss sustained by corpus upon the first sale. It was decided in Dickinson's Estate, 285 Pa. 449, that withheld earnings are applicable in the first instance to make up a previous loss in corpus, and that income is not entitled to any accumulated earnings until such loss is made good. It might be added that $48.90 is a negligible amount. The Auditing Judge, therefore, rules that income is not entitled to the $48.90.

Testator owned at the time of his death thirty shares of the United States Mortgage and Trust Company. On July 18, 1921, a stock dividend of 50 per cent. was declared. The stock dividend was apportioned between corpus and income. The details of this transaction appear on page 4 of the analysis. By reason of the declaration of this stock dividend and the purchase of a frac-

tional share from the *cestuis que trustent*, the stock owned by the trustee increased to thirty-six shares.

Six years later the capital stock was increased from $3,000,000 to $5,000,000. To carry out this purpose, a stock divided of 33⅓ per cent. was declared and the stockholders were given the right to subscribe to an additional number of shares at $250 per share, at the rate of one share for each three shares held. This stock dividend was properly apportioned, and the trustee received 4.02 shares. He purchased the fractional .98 share awarded to income, increasing his holding to forty-one shares. The book value of the stock after the declaration of the stock dividend was $206.2594.

The thirty-six rights to subscribe were sold for the sum of $2559.20, or at the rate of $71.09 a right, and the question for determination is who is entitled to the proceeds of sale.

Here it should be stated that prior to the decision in Jones *v*. Integrity Trust Co., 292 Pa. 149, stock rights were not apportioned between corpus and income. In that case, however, the Supreme Court said: "We now definitely decide that, where a corporation gives to the trustees of an estate the right to subscribe for new stock, and they avail themselves of such offer, the benefit resulting therefrom must be apportioned in the same manner as an extraordinary stock dividend would be; that is, there should be allotted to the corpus of the trust sufficient thereof to maintain unimpaired the intact value of the stock held by it, and the life tenant should receive the balance, because it represents corporate earnings which accumulated after he became entitled to all dividends at any time thereafter payable out of such accumulations."

When the *cestuis que trustent* received 7.98 shares of the stock dividend, they received the equivalent of the earnings withheld and to which they were entitled. Notwithstanding this, it is submitted in the analysis furnished that the *cestuis que trustent* are entitled to receive the proceeds derived from the sale of the rights.

Adopting the same simile that was used by Justice Simpson in the case referred to, the *cestuis que trustent* received for their penny (the accumulated earnings during the trust), the cake (their proportion of the stock dividend). Having parted with the penny, it could not be used to purchase either a portion or a whole of the stock rights, for Justice Simpson clearly stated that the reason the life tenant received the balance was "because it represents corporate earnings which accumulated after he became entitled to all dividends."

But let us delve a little deeper into the subject because we have other instances to deal with where rights to subscribe were given at less than the book value at that time and where there were earnings.

In the present instance, the book value of the stock is not impaired and the *cestuis que trustent* have received the earnings in the form of a stock dividend. The pertinent query suggests itself, what does the price received from the sale of the warrants represent, and the answer to that question is found in McKeown's Estate, 263 Pa. 78. In that case, all of the stock of the corporation was purchased by another corporation and the price paid for the stock exceeded the intact value of the same and the earnings accumulated during the existence of the trust. It was held that the excess belonged to corpus because it represented the inherent, intrinsic, or supervalue of the stock over and above its then book value. This case shows that so far as corpus is concerned there is not only an intact value, but an intrinsic value as well to be taken into consideration.

In the present instance, the buyer of the rights, in order to obtain one share of stock, had to pay to the corporation for a one-third share $83.33, and for each right entitling him to subscribe to one-third share he had to pay $71.09, or a total of $154.42 for one-third share, or for one share $463.26, whose book value was but $215.01. It is inconceivable that he paid that sum of money unless in his opinion the real value of the stock was far in excess of the book value. What does the difference in the cost to the purchaser of acquiring one share of stock by the buyer of the rights and the book value represent? It does not represent accumulated earnings because they form a component part of the book value. The reasonable explanation is that the buyer considered the stock worth more than its book value because of the high rate of earnings for every dollar invested, or because he believed that the assets of the company were worth a great deal more than the figure given in the statement issued by the company, or it may be that both elements entered into the situation.

It is a well-known fact that the difference in price between a stock before it sells ex-rights and its price after it sells ex-rights is the purchase price of the rights, in this case $71.09, but, notwithstanding the fact that the stock was subscribed for at a price higher than the book value, there was none the less a loss to the trustee of $71.09. This loss ought to be made good. Here, attention might be called to the fact that there was no real gain to the trustee due to the fact that the new shares were subscribed for at more than the book value. In such a case the buyer of the rights takes this fact into consideration and pays less therefor, and there is a corresponding loss to the trustee. It is obvious that if the subscription price in this case had been fixed at, say, $300 per share, the buyer of the rights would have paid $50 less. There is no gain to the trustee.

Issuing rights to subscribe to stock is a method adopted to raise money without borrowing it. A stock dividend, on the other hand, is a method adopted for capitalizing the earnings. When a corporation issues rights to subscribe, the privilege of subscribing is given to the stockholder, not because of any sentimental reason, but because the corporation managers realize that he may be injured if he is not given the right to subscribe because his fractional interest in the assets of the corporation will be reduced. In fixing the right to subscribe, the amount is usually fixed at a sum somewhat below what is considered the real value of the stock, and if the real value thus fixed is in excess of the subscription price, the holder of the stock necessarily suffers if he be not given the right to subscribe.

As already stated, where the shareholder does not subscribe his fractional interest in the assets is reduced. That which he owns is in effect split into two parts, stock ex-rights and rights, and when he sells he obtains for the two parts what he would have gotten had he sold the stock before the rights were issued. There is really no gain nor any benefit, and the same thing is true if he does subscribe. In the latter instance he winds up with more stock, but the stock at the book value after the rights have been exercised equals precisely the value of the original shares plus the cash paid for the subscription price.

Having taken this general view of the situation, let us consider the law as it stood prior to the decision in Jones *v.* Integrity Trust Co., *supra.*

In Wiltbank's Appeal, 64 Pa. 256, testator owned shares of stock in two corporations, both of which issued rights to subscribe. The trustee exercised the rights to subscribe in one instance and subsequently sold the stock at a sum in excess of the subscription price. In the other instance he sold the

rights. It was held that the profit realized from the sale of the stock and the amount received from the sale of the rights belonged to the *cestui que trust*. The report does not disclose what the book value of the stock was at the time when testator died. The court, however, did say that "there has been no serious diminution in the value of the old stock caused by the new issue, and therefore, this possible question is not before us."

In the later cases, however, and these were cases where the right to subscribe was given at less than the book value, the court held that the amount received from the sale of the rights belonged to corpus; but, as we have already seen, the corpus will be injuriously affected even though the subscription rights are higher than the book value, in cases where the real value exceeds the book value, and this happens to be true in all of the stock subscriptions now before the court. There can be no logical distinction between a case where the subscription price is fixed below the book value and a case where it is fixed above, if the real value as disclosed by the amount received from the sale of the rights exceeds the subscription price.

In Eisner's Estate, 175 Pa. 143, there is a clear recognition of the fact that the intrinsic value of the stock is a factor in considering what should be done with the price received from the rights. Penrose, J., whose opinion was confirmed in a *per curiam* opinion by the Supreme Court, said, at page 147:

"When new stock is issued at par the actual increase of capital is precisely the amount thus received by the company, and if the new stock has, at the time, an intrinsic value beyond what was paid for it, this presumptively can only be because the holders of the new stock have been put on a footing of equality with holders of old stock, and thus become entitled to share with them in a distribution of assets, should the company be dissolved. The gain of the new stockholders is the precise measure of loss of intrinsic value of the capital of the old stockholders."

In 2 Cook on Corporations (8th ed.), § 559, it is stated, as the result of numerous authorities there referred to: "The right to subscribe for new shares at par upon an increase of the capital stock, which is an incident of the ownership of the stock, does not belong as a privilege to the life tenant, but such an increment must be treated as capital, and be added to the trust fund for the benefit of the remaindermen. This is equally the rule whether the trustee subscribes for the new stock for the benefit of the trust or sells the right to subscribe for a valuable consideration. In either event the increase goes to the *corpus*. The subsequent income, however, of such increase belongs [as of course], during the continuance of the life tenancy, to the life tenant as income; the new shares are part of the *corpus*, and the life tenant, being entitled to the income from the *corpus*, takes the income from the accretions thereto."

In Veech's Estate, 74 Pa. Superior Ct. 373, 375, the court quoted with approval what was said by Cook in his treatise; and in reaching this conclusion that the amount received from the sale of rights belonged to corpus, the court distinguished Thompson's Estate, 262 Pa. 278, hereinafter referred to.

The other cases in which it was ruled that the proceeds derived from the sale of the stock rights went to corpus are Moss's Appeal, 83 Pa. 264, Biddle's Appeal, 99 Pa. 278, Smith's Estate, 140 Pa. 344, and Stokes's Estate (No. 1), 240 Pa. 277. See, also, Oliver's Estate, 136 Pa. 43.

Nor does the Auditing Judge consider Thompson's Estate, 262 Pa. 278, as establishing a different rule. In that case the national banking laws did not permit the declaration of a stock dividend. The managers wished to retain the accumulated earnings and the method they devised to accomplish this result was to declare a cash dividend and to give the stockholders the right to use

the cash dividend in payment of stock at par. The trustee exercised the right to subscribe with the sum received as a special dividend, and Justice Simpson, who delivered the opinion of the court, said that the trustee could have sold the option to subscribe, in which case he would have received more than $20,000 in addition to the cash dividend of $8000 and the life tenant would have received both cash sums; or, that he could have refused to exercise the option, in which case he probably would have been surcharged; and, third, he could have subscribed for the stock, which was the course which was actually pursued. Nothing was added to the assets of the corporation by the giving of the rights to subscribe. Disregarding the form, it was in substance a declaration of a stock dividend. In the opinion of the Auditing Judge, it cannot be considered a precedent in this case. Here the assets of the corporation were increased by the exercise of the stock rights, and no privilege was given to stockholders to use any part of the earnings to pay for the stock subscription. The Auditing Judge, therefore, rules that the money derived from the sale of the thirty-six rights to subscribe to stock belongs to the corpus of the estate.

The book value of the shares of the United States Mortgage and Trust Company after the declaration of the aforesaid stock dividend of 33⅓ per cent. was $206.2594. The effect of increasing the capital stock from $4,000,000 to $5,000,000 by giving the stockholders, in addition to the stock dividend, the right to subscribe to $1,000,000 par value of stock at the rate of $250 per share, has not been considered. The computation is as follows:

| | |
|---|---|
| 40,000 shares @ $206.2594 | $8,250,376 |
| 10,000 shares @ $250 equals | 2,500,000 |
| 50,000 | $10,750,376, or |

$215.01 per share. The sum of $215.01 per share must be considered the intact value: see Dickinson's Estate, 285 Pa. 449.

In 1929 the United States Mortgage and Trust Company and the Chemical National Bank merged. The title of the new company was Chemical National Bank and Trust Company. Prior to the merger, the United States Mortgage and Trust Company increased its capital stock from $5,000,000 to $8,000,000, and gave each shareholder the right to subscribe at par for three new shares for every five held.

The Chemical National Bank, prior to the merger, declared a stock dividend of $4,000,000, increasing its capital from $6,000,000 to $10,000,000, and gave such stockholder two shares for every three shares then held.

The trustee accordingly received warrants to subscribe to 24 3/5 shares of the United States Mortgage and Trust Company, which were sold, and the net amount received therefor was $15,292.96, which was credited to principal.

The par value of the stock was reduced from $100 a share to $10 a share. The stockholders of the Chemical National Bank received ten shares for each share of the old stock, but the stockholders of the United States Mortgage and Trust Company received but six and a quarter shares of stock for their old stock. The trustee surrendered his certificate for forty-one shares and received therefor 256¼ shares of the Chemical National Bank and Trust Company.

As has already been pointed out, the intact value of the forty-one shares was $215.01, and forty-one times $215.01 equals $8815.41. The book value of the 256¼ shares was $24.0022 per share, or a total of $6150.56, and there was, therefore, a loss in the intact value of the difference between $8815.41

and $6150.56, or $2664.85. Of the $15,292.96 received from the sale of the rights, $2664.85, therefore, belongs to the corpus of the estate.

Out of the difference between $15,292.96 received from the sale of the forty-one rights and $2664.85, or $12,628.11, the two surviving *cestuis que trustent* are entitled to receive, share and share alike, the earnings made between the time of the merger and the time when the capital of the United States Mortgage and Trust Company was increased to $5,000,000; any excess belongs to the corpus of the estate.

After the completion of the merger, the book value of the 256¼ shares was $24.0022 per share, and, as already stated, the book value of the old shares of the United States Mortgage and Trust Company, after the capital was increased to $5,000,000, was $215.01 per share, or, on a basis of $10 per share, $21.501. The difference between $24.0022 and $21.501, or $2.5012, represents the earnings. Multiplying this sum by 256¼ gives us $640.93, which sum is awarded equally between Ethel N. W. Brandon and Charlotte E. Jenkins. The difference between $12,628.11 and $640.93, or $11,987.18, is also awarded to the corpus of the estate.

We will now take up the rights to subscribe given by the Guaranty Trust Company of New York to its stockholders. Testator at the time of his death owned forty-five shares of the stock of said company, having a book value of $368.47 per share. The capital stock of the company was $2,000,000. Rights to subscribe were given on seven different occasions. Due to consolidations and the giving of these rights to subscribe, the capital stock of the company at the end was $90,000,000, and a calculation will disclose that if the trustee had in each instance exercised his right to subscribe he would have had, at the time after the capital was increased to $40,000,000, 10.8 times forty-five shares.

The first increase in the capital stock was from $2,000,000 to $5,000,000. The Guaranty Trust Company consolidated with two other corporations, whose combined capital was $2,000,000. For every share of stock that the trustee held in the Guaranty Trust Company he received a share of the consolidated company, and the other two corporations between them got a share of stock for every share that the stockholders of the Guaranty Trust Company got. The stockholders of the latter company were also given the right to subscribe at par to $1,000,000 of the stock. Just prior to the consolidation, the book value of the Guaranty Trust Company stock was $530.25. The book value after the consolidation was $516.78. For a share of stock worth $530.25, the subscription price to one-half share, $50, or a total of $580.25, the stockholders of the old Guaranty Trust Company received one and one-half shares of the stock of the consolidated company. It would seem that there was a gain, therefore, to the stockholders of the old company of the difference between $580.25 and $775.17, or $194.92.

It would seem at first glance that the two companies that were taken into consolidation contributed more assets than the old Guaranty Trust Company did. This is probably, however, not the case. The more reasonable assumption seems to be that the other two corporations considered that the value of the assets of the old Guaranty Trust Company was greater than shown by the book value. In other words, there was in effect a reappraisement which fixed the value of the Guaranty Trust Company's assets as $516.78 a share. This gain, if it be a gain, could not have been attributable to accumulated earnings during the existence of the trust, for they were included in the book value of $530.25 a share. The Auditing Judge, therefore, treats this as a capital gain.

On the second occasion, the capital stock was increased from $5,000,000 to $10,000,000. The stockholders of the old Guaranty Trust Company received a share of stock in the new company for every share held, and the shareholders of the other corporation, which was merged with the Guaranty Trust Company and which had a capital stock of $1,000,000, received a share of stock in the new company for every share held. The stockholders of the old Guaranty Trust Company were given the right to subscribe to the extent of 80 per cent. of their holdings. The book value of the stock of the old Guaranty Trust Company, before the increase in capital, was $540.60. The book value of one share of stock, after the merger, was $333.24. For one and one-half shares of stock having a book value of $540.60 per share, or $810.90, plus $120, the subscription price of one and two-tenths shares, making a total of $930.90, the stockholder of the old Guaranty Trust Company received two and seven-tenths shares at a book value of $333.24 per share, or $899.75. The stockholder in the old Guaranty Trust Company therefore received $11.54 a share less than what his own stock was worth, and consistently with the ruling made with respect to the first consolidation, the Auditing Judge treats this as a capital loss. Before stating the facts with respect to the subsequent increases in capital, it should be stated that the trustee exercised his rights to subscribe on the first occasion and that he subsequently sold the five-tenths share for the sum of $400. On the second occasion, he subscribed at par for fifty-three and six-tenths shares, and subsequently sold the six-tenths share for $366. The *cestuis que trustent* have waived their rights to receive any earnings included in the price paid for the stock, and for that reason no further consideration need be paid to this matter.

On the third occasion, the capital stock was increased from $10,000,000 to $20,000,000, and the stockholders were given the right to subscribe at par to the extent of 100 per cent. of their holdings. The trustee subscribed to ninety shares and sold the rights to subscribe to the other thirty shares for $9397.50.

On the fourth occasion, the capital stock was increased from $20,000,000 to $25,000,000, and the stockholders were given the rights to subscribe at par to the extent of 25 per cent. of their holdings. The trustee sold the rights to subscribe to fifty-two and one-half shares for $13,203.75.

On the fifth occasion, the company increased its capital stock from $25,-000,000 to $30,000,000, and gave its stockholders the right to subscribe at $200 per share to the extent of 20 per cent. The trustee sold the forty-two rights for the sum of $9732.24.

On the sixth occasion, the corporation increased its capital from $30,000,000 to $40,000,000, and gave its stockholders the right to subscribe at $300 a share to the extent of 33⅓ per cent. of their holdings. The trustee sold the rights to subscribe for seventy shares for $27,616.06. After the capital had been increased to $40,000,000, a consolidation took place between the Guaranty Trust Company and the National Bank of Commerce. As a preliminary step, the National Bank of Commerce increased its capital stock from $25,000,000 to $30,000,000, and gave its stockholders the right to subscribe at par to the extent of 20 per cent. of their holdings. The book value of the stock, prior to the issuance of the rights, was $297.27, and after the issuance of the rights, from a mathematical standpoint, it was $264.39 ($297.27, plus 20, divided by 1.2). The book value of the shares of the Guaranty Trust Company at this time was approximately the same.

The analysis states that the book value of the stock after the consolidation was $266.3115 per share. As the book value of both of these companies before the consolidation was less, the query that naturally suggests itself is

why. Here it is to be borne in mind that usually some time elapses between the time when the statement is issued and the time when the stock has been subscribed, and in the meantime earnings may accumulate. The condition is no doubt due to such earnings, and the Auditing Judge, in subsequently calculating the earnings, adopts as the figure $266.3115.

The agreement between the two companies provided that the stockholders of the National Bank of Commerce should receive three shares of stock in the new company for every three shares of stock they held, and that each shareholder of the Guaranty Trust Company should receive for four shares of stock of the old company four shares of stock in the new company.

After this consolidation had taken place, the trustee sold 110 shares of stock of the Guaranty Trust Company for the aggregate sum of $107,575.60. The *cestuis que trustent* have waived their right to receive any undistributed earnings included in the sale price, and, therefore, no further consideration is given to these earnings.

After the consolidation of the Guaranty Trust Company and the National Bank of Commerce under the name of the Guaranty Trust Company of New York, the consolidated company increased its capital stock from $70,000,000 to $90,000,000 and gave its shareholders the right to subscribe to the extent of two-sevenths of their holdings. At this point it is proper to state that the trustee at the time of the consolidation owned 100 shares of the National Bank of Commerce stock, and for these shares he received 100 shares of the stock of the new company, thus making his total holdings 200 shares of the stock of the new company. He, therefore, had the right to subscribe to fifty-seven and one-seventh shares of stock. For the sake of convenience, however, the Auditing Judge at this point simply deals with the 100 shares of stock of the Guaranty Trust Company that the trustee owned before the consolidation, and as to them, he received one-half of fifty-seven and one-seventh rights, or twenty-eight and eight-fourteenths rights, which he sold. He received for the rights $21,098.84.

The question before the court is the proper apportionment of the money received from the rights to subscribe.

The Auditing Judge will consider first the status after the capital had been increased to $40,000,000 and before the merger with the National Bank of Commerce. In order to determine the amount of the earnings from the time of the death of the testator up to the time after the consolidation had taken place with the National Bank of Commerce, it is necessary to ascertain first of all what the intact value of the stock would have been if the testator had subscribed in every instance to the full extent of the subscription rights.

For the purpose of easy computation, let us assume, for example, that the testator owned at the time of his death 100 shares of a book value of $368.47. If he had subscribed in every instance to stock he would have had, after the capital was increased from $30,000,000 to $40,000,000, 1080 shares, computed as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Owned at the time of testator's death | | | | | ............... | 100 | shares |
| 50 per cent. subscription on 100 shares | | | | | ............. | 50 | " |
| 80 " | " | " | " | 150 | " | ............. | 120 | " |
| 100 " | " | " | " | 270 | " | ............. | 270 | " |
| 25 " | " | " | " | 540 | " | ............. | 135 | " |
| 20 " | " | " | " | 675 | " | ............. | 135 | " |
| 33⅓ " | " | " | " | 810 | " | ............. | 270 | " |

Total .................................. 1080 shares

The cost to the trustee would have been:

| | | | |
|---|---|---|---|
| 100 shares | @ | $368.47 | $36,847 |
| 50 " | @ | 100.00 | 5,000 |
| 120 " | @ | 100.00 | 12,000 |
| 202.05 " | @ | 100.00 (75 per cent. of 270 shares) | 20,250 |
| 67.5 shares | @ | $100 (25 per cent. of 270 shares) | 6,750 |
| 135 " | @ | 100 | 13,500 |
| 135 " | @ | 200 | 27,000 |
| 270 " | @ | 300 | 81,000 |

making a total of ............................................. $202,347
which, divided by the number of shares, gives us a price of $187.35 per share. To this total, however, must be added the gain in capital in the first consolidation, and from it must be subtracted the loss in capital in the second consolidation.

As we have already seen, in the first consolidation there was a gain of $19,492, and in the second consolidation there was a loss of $3,115.80. To the $202,347 is therefore to be added $19,492, making a total of $221,839, and from it is to be subtracted $3115.80, leaving a balance of $218,723.20, which, divided by 1080, makes a value per share of $202.52.

As already stated, the book value of the stock after the consolidation with the National Bank of Commerce was $266.3115 per share, and the difference between that sum and $202.52, or $63.7915, represents the earnings.

After the consolidation the trustee sold 110 shares, and the *cestuis que trustent* waive their right to receive from the sale price any earnings included therein. The two surviving *cestuis que trustent*, Ethel N. W. Brandon and Charlotte E. Jenkins, should, therefore, receive out of the amount realized from the sale of the warrants $6379.15, share and share alike.

Up to the time when the capital stock was increased from $70,000,000 to $90,000,000, the earnings per share were $2.66, and the *cestuis que trustent* are entitled to receive the additional sum, $2.66, out of the sale price of the stock rights. The balance belongs to corpus and this balance is composed of the amount necessary to make up the intact value and the intrinsic value.

It may be at some later period a stock dividend will be declared and it will be necessary to know what the intact value of the shares is at this time. The answer is that it is the book value of the shares at the present time, $320.01.

When stock rights were given to subscribe at less than the book value, the book value decreased because of the greater number of shares, but for this decrease the trustee has been compensated in giving him a portion of the proceeds derived from the sale of the rights. The depreciated book value, therefore, represents the intact value. Where stock was sold at more than the book value, the book value increased, but the buyer of the rights took this into consideration in fixing the price of the rights and, therefore, paid less than he would otherwise have paid. In other words, the trustee has paid for the increased book value and, therefore, the increase belongs to him. There has been no actual division of the earnings, but as the *cestuis que trustent* have received out of the proceeds derived from the sale of the rights, the earnings, there has been in' effect a purchase of these earnings by the trustee. These earnings still remain in the hands of the corporation and increase the book value.

In the last consolidation there was a gain in book value of the difference between $320.01, minus $2.66 earnings, or $317.35, and $266.3115, or $51.03, and the buyer of the rights took this into consideration when he fixed the

price for the rights. Here, again, in effect there was a purchase of this gain by the trustee. Taking all these facts into consideration, it necessarily follows that it would be erroneous in making the calculation simply to take into consideration the actual amount paid by the trustee plus the book value at the beginning.

Before taking up the subject of the cash dividend declared by the National Bank of Commerce and the amount received from the sale of rights issued by it, a final word on this subject of apportionment of stock rights may not be out of place, even though at the risk of repetition.

In every instance where rights were given to subscribe, after deducting the amount necessary to make good the intact value and the earnings in interim periods, there was always a balance. This demonstrates without any question that the market value was in excess of the subscription price, and this difference between the market value and the subscription price was quite considerable in amount. It has already been stated that the fractional interest of the trustee in the assets was always reduced because of the additional number of shares that were issued. From a book value standpoint, the book value went down when stock was sold at a lesser sum, and the book value went up when it was sold for a larger sum. Taking market values, however, into consideration, and they were always in excess of the subscription price, there was in every instance a loss to the trustee because of the additional number of shares outstanding. In other words, the trustee had a lesser fractional interest, and from a market standpoint he lost every time. In effect, he was compelled either to subscribe or to sell a fractional interest of what he owned, and the price that he received from the rights was the price of the fractional interest that he was compelled to part with. In other words, the real value of the stock ex-rights plus the amount received from the rights equaled the value of the stock before rights were issued.

Testator owned at the time of his death five shares of stock of the Hide and Leather National Bank and eighty-four shares of stock of the National Bank of Commerce. By reason of a consolidation of the Hide and Leather National Bank with the Western National Bank and subsequent consolidation of the Western National Bank with the National Bank of Commerce, the trustee wound up with 167 shares of stock of the National Bank of Commerce, having an intact value of $26,735.97.

In October, 1903, a cash dividend of 57¼ per cent. was declared, and the trustee received $4830. From the analysis, it appears that the earnings from the time of the death of the testator to the time when the cash dividend was declared were $2088.94, two-thirds of which is awarded to the executor of the estate of Bessie V. Waterhouse, deceased, and one-third to Charlotte E. Jenkins. After the declaration of the dividend, the book value of the 167 shares was $24,136.69, or $144.53 a share. There was a loss, therefore, in the book value of the difference between $26,735.97 and $24,136.69, or $2599.28, and principal was, therefore, entitled to receive that much out of the $4830. This sum added to the $2088.94, representing earnings, makes $4688.22, and the difference between $4830 and $4688.22, or $141.68, is treated as a gain derived from principal in the exchange of the securities when the consolidations took place. This sum of $141.68 represents in part the enhancement, intrinsic or supervalue, of the stock over the book value.

Bessie V. Waterhouse died August 16, 1921. The book value of the 167 shares of the National Bank of Commerce at the date nearest her decease was $241.9408 per share, or $40,404.11. On February 27, 1929, the trustee sold sixty-seven of these shares for $57,339.52. The intact value of the 167 shares held by the trustee was $144.531 ($24,136.69 divided by 167). At the date of

the death of Bessie V. Waterhouse the book value of this stock had increased to $241.9408, an increase over the intact value of $97.4098, or a total increase of $6526.4566, and the Girard Trust Company, executor of the will of Bessie V. Waterhouse, deceased, claims one-third of $6526.4566, or $2175.4855, as representing income earned in her lifetime. It should further be stated that at the time testator's daughter left the convent the book value of the stock was less than it was at the time of his death. She is, therefore, not entitled to any portion of the gain.

The sale of these sixty-seven shares occurred more than seven years after the death of Bessie V. Waterhouse and at a time when the entire income was payable to the two daughters. In Graham's Estate, 296 Pa. 436, the question of apportionment between successive life tenants arose. This court held that it was immaterial whether anything or nothing was earned during the lifetime of the deceased life tenant; in any event, the surviving *cestuis que trustent* were alone entitled. On appeal to the Supreme Court, the judgment of the court below was affirmed on the ground that there were no figures submitted showing how much had been earned during the lifetime of the deceased life tenant. Justice Kephart, who delivered the opinion, said, *inter alia:* "Here, the first thing to be done was to establish earnings during the lifetime of the first taker . . ." (p. 439) "but there is no evidence to show earnings to the first life tenant's death . . ." (pp. 439 and 440) "We have no evidence of earnings . . ." (p. 440) "As it is, any decision on the main point presented by appellant will not be discussed" (p. 440). The main point to which Justice Kephart referred was the apportionment between successive life tenants.

Counsel for the executor of the will of Bessie V. Waterhouse also relies upon the adjudication made by Stearne, J., in the Estate of Edward T. Dobbins, deceased, as of July Term, 1906, No. 135. An examination of the record in that case shows that a dividend was declared after the death of two life tenants. One of the life tenants died in 1917 and the other in 1929. The residuary legatees claimed the dividend. The court held that as the earnings in the lifetime of the two *cestuis que trustent* exceeded the amount of the dividend, it was to be treated as income. Counsel for the personal representatives of the two deceased life tenants requested that the amount of the dividend be awarded share and share alike, and the Auditing Judge awarded accordingly. In the opinion of the Auditing Judge, the court did not rule upon the question involved in this case. In the circumstances, the Auditing Judge feels that he is bound by the decision on this point by this court, although he realizes that it is, in view of what the Supreme Court has said, *obiter dicta*. He, therefore, rules that the executor of the estate of Bessie V. Waterhouse, deceased, is not entitled to any portion of the price received from the sale of these sixty-seven shares of stock.

The Auditing Judge understands that the two daughters agree, so far as they are concerned, that the amount received from the sale of stock shall remain in the principal account.

It was also contended by counsel for the accountant that, despite the testimony of the assistant comptroller of the Guaranty Trust Company of New York that the increase in the book value of the stock was due wholly to undistributed earnings, it should not be considered conclusive because it appeared that there were United States bonds and other standard investments among the assets of the bank, and that these had increased substantially at the time of the death of the life tenant and were a capital gain. In the circumstances, it is unnecessary to pass upon this contention, but the Auditing Judge is of the opinion, and so rules, that the increase in book value was due to undis-

tributed earnings, especially in view of the fact that there was no evidence that any securities were sold and any profit realized that was carried into the surplus, and even if the securities were sold and a profit made it might be a question whether such profit was not to be considered, taking into consideration the nature of the business of the corporation, as earnings.

In February, 1929, the National Bank of Commerce and the Guaranty Trust Company consolidated. The facts have already been stated. The trustee received warrants to subscribe to twenty shares of the National Bank of Commerce, which were sold for $16,749.80.

The book value of the stock prior to the merger was $297.2713, and the intact value was $144.531, a difference of $152.7403, and the book value at the time of the death of Bessie V. Waterhouse was $241.9408, an increase over the intact value of $97.4098.

By reason of the increase in the capital stock from $25,000,000 to $30,000,000, and the fact that the new stock was sold at par, or at $197.2713 less than the book value, the book value of the total number of shares was reduced, according to the figures submitted, to $266.3115, or a difference of $30.9598, or a loss on 100 shares of $3095.98, but this increase in the capital stock of the National Bank of Commerce from $25,000,000 to $30,000,000 was but a preliminary step leading to a merger of the Guaranty Trust Company and the National Bank of Commerce with a capital of $90,000,000, and as the $20,000,000 of new stock was issued at $500 per share, or more than the book value, there was a gain to offset this loss, and from the statement issued by the Guaranty Trust Company of New York after the merger was completely effected, it appears that the book value of the stock was $320.01 per share. For reasons already given, the Auditing Judge rules that the executor of the will of Bessie V. Waterhouse, deceased, is not entitled to any portion of the earnings; that the two *cestuis que trustent* are entitled, share and share alike, to the earnings on 100 shares, $15,274.03, and the rest goes to corpus.

The trustee also received rights to subscribe, by reason of the increase in the capital stock from $70,000,000 to $90,000,000 already referred to, to twenty-eight and eight-fourteenth shares of stock of the Guaranty Trust Company of New York, which it sold for the sum of $10,549.42, and the executor of the will of Bessie V. Waterhouse, deceased, claims that she is entitled to receive a portion of the sale price. This claim is dismissed for reasons already given.

As already stated, the earnings on the 100 shares of the Guaranty Trust Company between September 27, 1929, after the capital had been increased to $90,000,000, and June 29, 1929, after the Guaranty Trust Company and the National Bank of Commerce had merged with a capital of $70,000,000, amounted to $266, and this sum is awarded, share and share alike, to the two *cestuis que trustent,* and the balance of the $10,549.42 to corpus. . . .

*Barnes, Biddle & Myers* and *Fell & Spalding,* for exceptants.

*Theodore S. Paul,* for trustee; *Jerome J. Rothschild,* for guardian ad litem.

PER CURIAM, October 30, 1931.—The exceptions in this case have been twice presented to the court *in banc.* After the first hearing the record was remitted to the Auditing Judge to enable him to make certain corrections in his figures. He then gave counsel a further hearing, filed a substituted adjudication, and it was agreed that the old exceptions should be considered as if filed to the substituted adjudication, together with such new ones as might be filed by the parties.

This record presents a very complicated state of facts and figures. Few, outside of trained accountants, can with facility properly apply the law to such a mass of figures.

The proofs submitted were meager. A complete surplus account, showing its origin and growth for the periods in question, could readily have been obtained from each of the corporations whose stocks are before us; and then the rights of the life tenants and remaindermen could have been equitably and accurately ascertained.

We are not convinced of the errors complained of, and, hence, they are dismissed and the adjudication is confirmed absolutely.