# Dickinson's Estate.

*Corporations—Dividends—Extraordinary dividends—Stock divi-dends—Sale of additional stock—Right to subscribe—Life tenant and remainderman—Income and principal—Decedents' estates.*

1. Usually, where extraordinary dividends, whether of cash, scrip or stock, are declared and paid on shares of corporate stock left by a decedent in trust, they are to be distributed by giving to the corpus sufficient to keep intact the value of the shares as they were at the time the trust began, and by giving the rest of the dividend to those entitled to the income of the estate.

2. So long as the estate retains such stock, however, it is held at the risk of the corporate business; hence if the corporation suffers an extraordinary loss, which not only exhausts all the income which had been accumulated after the trust began, but also a part or all of that which had accrued prior thereto, the intact value of the shares, as they existed when the trust began, must be reduced accordingly, and, in making distribution between the life tenant and the corpus of the estate, future extraordinary dividends of the corporation must be so apportioned that the corpus will be awarded only so much as shall be necessary to maintain the value of the shares as they existed after the extraordinary corporate loss was paid, and not as they were at the time the trust began.

3. If a corporation issues and sells additional stock, at a price in excess of its par value, the proportionate part of such excess, held by the corporation and not distributed, will, as between the life tenant and the corpus of the estate, be treated as a capital

increase, and will not, when future extraordinary dividends are declared, be considered as income and to be awarded to the life tenant.

4. If a corporation gives to its shareholders a right to subscribe to additional stock, and the estate sells this right, the fund thus received, will, as between the life tenant and the corpus of the estate, be treated as a capital increase, and will not, when future extraordinary dividends are declared, be considered as income and awarded to the life tenant.

5. In distributing an extraordinary stock dividend, it will be treated exactly as it is, and not as if it were a cash dividend, even though the corporation had a sufficient surplus to declare an extraordinary cash dividend equal in amount to the par value of the shares included in the stock dividend.

6. Such distributions, as between the life tenant and the corpus of the trust estate, must be made according to equitable principles, and neither the par value nor the market value of the shares plays any part in the distribution, but only their intrinsic value.

Argued November 24, 1925. Appeals, Nos. 325 and 326, Jan. T., 1925, by Mahlon H. Dickinson et al., from decree of O. C. Phila. Co., April T., 1901, No. 202, dismissing exceptions to adjudication in Estate of Mahlon H. Dickinson, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Exceptions to adjudication of GEST, J.

The opinion of the Supreme Court states the facts.

Exceptions dismissed in opinion by THOMPSON, J. Mahlon H. Dickinson et al., appealed.

*Error assigned* was, inter alia, decree, quoting record.

*Arthur E. Weil,* with him *Albert L. Moise,* for Mahlon H. Dickinson et al., appellants, cited: Willcox's Est, 66 Pa. Superior Ct. 182.

*Francis R. Matlack,* for William W. Dickinson, appellant.

*Joseph H. Grubb, Jr.*, with him *Peter M. MacLaren*, for appellee, cited: Wilcox's Est., 66 Pa. Superior Ct. 182; Eisner's Est., 175 Pa. 143; Veech's Est., 74 Pa. Superior Ct. 373.

OPINION BY MR. JUSTICE SIMPSON, February 8, 1926:

Testator gave a portion of his estate in trust to pay the income to his nephew and his nephew's wife for their respective lives, and upon their decease to divide the principal among their descendants per stirpes. Among the assets which passed to the trustees, was 120 shares of the stock of the Fire Association of Philadelphia. Its capitalization at that time was 10,000 shares, each having a par value of $50, a liquidating or intrinsic value of $142.61, and a market value of $415, at which latter figure the 120 shares were awarded to the trust estate. Ordinary cash dividends, regularly declared by the corporation, were received by the trustees and paid to the life tenants, but these are of no moment here. The present controversy concerns the distribution of an extraordinary stock dividend of 100 per cent, which the company declared, and for which it delivered to the surviving trustee another certificate for 120 shares. On an adjudication of the trustee's account, the court below awarded the whole of this new stock to the widow of the nephew (he having died before the dividend was declared), whereupon her children prosecuted these two appeals.

Under ordinary circumstances, the applicable rule is plain; and is to be employed, when distribution is being made by the court among those interested in the trust estate, irrespective of the account against which the corporation enters, on its books, the total payments to the stockholders generally. From Earp's App., 28 Pa. 368, to Harkness's Est., 283 Pa. 464, we have uniformly held that, "where extraordinary dividends, whether of cash, scrip or stock, are declared and paid on shares of corporate stock left by a decedent in trust, they are to be

distributed by giving to the corpus sufficient to keep intact the value of the shares as they were at the time the trust began, and by giving the rest of the dividend to those entitled to the income of the estate." Following our lead, this has become the rule in nearly all the states of the Union: Harkness's Est., supra. In the instant case, however, there are several unusual circumstances, not appearing in any of our decisions, and we are now required to determine in what way distribution should be made, in view of this altered situation. Happily, all the relevant facts and figures are admitted.

Some six years after the trust began, the corporation suffered and paid a heavy loss, caused by the great fire in San Francisco. The effect of this payment was not only to exhaust all the undistributed income which had been accumulated after the death of testator, but also to partially deplete that which existed prior thereto, thus reducing the then liquidating value of the stock from $142.61 to $71.09 per share. Appellants seem to think that no consideration should be given to this loss, for, without referring to it, they make all their calculations upon the basis of the value of the stock as it existed at the time of testator's death. It is clear, however, that when testator, expressly and without qualification, gave to his nephew and his nephew's wife all the income earned after his, testator's death, he meant just what he said, and hence that gift cannot properly be cut down, for the benefit of the remaindermen, because the corporation was compelled, in order to meet an extraordinary loss, to use a portion of the surplus which had been accumulated before testator's death. The possibility of such a loss was doubtless one of the principal reasons for not distributing all the surplus when and as earned, and this every one interested in the stock was bound to know. Its retention was, therefore, subject to this business risk (see Willcox's Est., 66 Pa. Superior Ct. 182), which might result not only in depleting or consuming the surplus, but also in impairing or wholly exhausting the capi-

tal. Each interest in the stock was subject to so much of that risk as appertained to its respective share in the capital and surplus, and the remaindermen have no more right to ask the life tenant to make good, out of future earnings given to her by the will, so much of the loss as affected the surplus which had accrued before the death, than they would have to so demand regarding the capital, if it also had been impaired or exhausted. Each must bear his own share of the loss; and, hence, in determining how this subsequent extraordinary dividend should be distributed, we must start with the fact that what for convenience we shall call the "intact value" of the stock in the trust, was but $71.09 a share, from and after the payment of that loss ($50 thereof being its par value), and the remaining earned surplus of the corporation was then only $210,900.

In order to restore, and later to increase, its financial standing, the association, on three several occasions, issued new stock at a price above par, and carried the excess to what it termed a "contributed surplus account." As this was not income which had accrued on the stock, but rather represented a part of the excess of market value over par value, it necessarily belonged, as appellee frankly admits, to the corpus of the trust (Graham's Est., 198 Pa. 216), and the intact value of each share was increased accordingly. On the first occasion, 5,000 new shares were issued and sold, at $300 per share, the $250 excess over par thus realizing $1,250,000. On the second occasion, another 5,000 new shares were issued and sold, at $250 per share, the $200 excess over par thus realizing $1,000,000. The third occasion, though provided for by resolution adopted on the same day as the 100 per cent stock dividend was declared, was not intended to take effect at once, and in fact the new stock then authorized was not issued and paid for until some months after the stock dividend was distributed; hence, since it did not affect the status then existing, it need not be considered in this opinion.

Immediately preceding the distribution of the stock dividend, the corporation had, therefore, 20,000 shares of stock outstanding, a paid-in capital of $1,000,000 and a contributed surplus of $2,250,000. The aggregate of these two sums, divided by 20,000, shows a net valuation of $162.50 for each share, and when to this is added the $21.09 (which represents the proportion of the earned surplus remaining after the settlement of the San Francisco fire loss), a then intact value of $183.59 appears. The declaration and distribution of the stock dividend here involved, resulted in the corporation having 40,000 shares of stock, with a paid-in capital and contributed surplus of $3,250,000, the same as above, and an earned surplus of $2,936,313.41; these sums, aggregating $6,-086,313.41, when divided by the 40,000, gives a valuation of $152.16 per share. Since this was less than the intact value of $183.59, the difference of $31.43 per share, must, under the rule hereinbefore quoted, be made good out of so much of the stock dividend as does not represent income earned after testator's death (but which is, in fact, an amount necessary to prevent a depreciation of the intrinsic value of the corpus as a result of the stock dividend), and only the balance (which really represents the earnings which accrued after the fire), should be awarded to the life tenant. Multiplying the $31.43 by 120 shares gives $3,771.60, and dividing that sum by the new value of $152.16 per share, shows that 24 shares and $119.76 in cash must be awarded to the corpus of the trust, in order to restore the intact value, and the balance of 95 shares and $32.40 in cash therefore belongs to the life tenant. That this does no more than preserve the principal of the trust is evident from the fact that 144 shares at $152.16 per share and $119.06 in cash, together amount to $22,030.80, and so do 120 shares at $183.59.

The principal error of the court below was in treating this extraordinary stock dividend as if it was a cash dividend, which would be equivalent to a distribution of

the stock at its par value; whereas, as shown above, the
actual value of the shares was far in excess of their par
value, and the market value, as the court below finds,
was much greater yet. Such distributions must be made
according to equitable principles, however, and neither
par value nor market value play any part in them, but
only intrinsic value: Smith's Est., 140 Pa. 344. The
need for care in keeping this fact in mind, becomes ap-
parent when it is recalled that in many instances the
actual value of stock greatly exceeds its par value, and
is much less than its market value, as witness the vari-
ances respecting this stock, set forth at the beginning of
this opinion. Often these differences are still greater,
the stock of the Union Trust Company of Pittsburgh, for
instance, showing a par value of $100, a liquidating
value of $3,250 and a market value of $5,500 per share.
Every one would probably concede that an attempt to
distribute a stock dividend of that corporation on the
basis of its par value, would, under the circumstances
here appearing, work monstrous injustice to the remain-
dermen, yet the difference between that and the present
instance is one of degree only.

Lest it be supposed we have overlooked the fact, it
should be stated that, in each instance where the shares
were increased, the stockholders, including this estate,
were given the right to take the new stock at the price
fixed by the corporation. The trustees elected, however,
to sell the rights thus given, and the sums realized were
credited to the corpus of the trust. This was a correct
disposition of the matter: Thomson's Est., 153 Pa. 332;
Eisner's Est., 175 Pa. 143; 2 Cook on Corporations (8th
ed.) section 559. In no sense could these sums have
been considered income; they were rather profits on the
capital investment, which always belong to capital: Gra-
ham's Estate, supra.

The decree of the court below is reversed, and the rec-
ord is remitted in order that distribution may be made

in accordance with this opinion, each party to bear his own costs.

DISSENTING OPINION BY MR. JUSTICE KEPHART:

I disagree with the conclusion reached by the majority. While, as the opinion states, "it is clear...... that when testator expressly and without qualification gave to his widow all the income earned after his death, he meant just what he said," it is just as clear that the same testator gave to the remainderman an estate which cannot properly be cut down merely because the corporation sustained a loss in its earnings while pursuing the business for which it was incorporated. This was a fire insurance company, and it was the company's business to pay the loss here involved, one of the recognized hazards of the business being its extraordinary size. It was an operating loss to be recouped through future earnings and not a capital loss. Insurance rates are regulated to take care of such losses. Testator's capital in the concern should not be reduced when it comes to the remainderman, simply because the company paid such loss out of earnings.

To distribute the stock dividend on the basis of a value per share of $71.09 as the lowest point in value the stock attained since testator's death and not the value at the date of his death, violates the rules laid down by this court as to intact value. In that event, the settlement of like estates in the future will be the subject of expert accounting to ascertain if there are any points lower than that at testator's death, for the majority opinion does not limit the distribution to extraordinary losses outside of the company's usual activities but includes all business losses.

The majority opinion attempts to divide the loss of $1,835,000 from the San Francisco fire between the respective interests of the life tenant and the estate. Its theory seems to be that, as to so much of that sum as could be paid out of earnings accumulated after testator's

death, it is an operating expense and to be paid out of the earnings to which the life tenant is entitled. However, as to that portion of the loss, $715,140, which was met by payments from surplus accumulated before the death of the testator, the court holds that this is a *capital loss* and must be borne by capital, the corpus of the estate, or intact value. I am of opinion such a distinction is clearly not tenable. For example, if the loss, in this case $1,835,000, had occurred immediately following testator's decease, the estate's interest would have been completely wiped out and the life tenant would become entitled to not only all future earnings but all stock dividends. The physical property or the means of producing earnings (payment from policyholders) would not be wiped·out, but the book value on which the majority opinion depends would be nothing. On the other hand, if the loss had occurred in 1924, with the then large earnings, the entire burden would be met by the life tenant. Can such a principle as this be sustained as working out an equitable allocation of loss between the two interests in the stock?

It is submitted that losses of this character can only be treated in one of two ways, either as a capital loss and properly chargeable to the corpus of the estate, or as operating losses which must be charged to the life tenant in any computation as to his or her accumulated interest. The majority opinion has indicated that this is at least in part a capital loss. That is contrary to what I understand to be well settled principles of accounting, and to the practice in insurance business. Let us see what would be the effect of a correct application of this theory. To be consistent, if this earning surplus loss is to be considered a capital loss in any part, it must be so regarded as a whole. Under this view, the majority should include all the earnings since testator's death, if the widow was not to be deprived of "all the income earned after his death." Just before the fire the earned surplus had increased to $2,045,000. Why make the

estate account for part of the lost earned surplus and
omit the remainder? In starting at $71.09 the majority
fails to consider the accumulation of earning that made
the stock worth $254 a share the day before the fire. The
sum earned between testator's death and the fire was
$1,119,860. If the fire loss is to be treated as a capital
loss, then the computation of the majority must be
amended.

Before proceeding with this calculation, it is neces-
sary to correct what I deem an error in the computation
of the intact value by the majority. In computing the
intact value, the estate has been given credit for the
contributed surplus but no account has been made to
cover the consequent reduction of interest of the original
shareholders in the earned surplus at the time of the
distribution. This reduction was a necessary incident to
the readjustment of the capitalization. There should be
added $10.55 per share instead of $21.09 to secure the
intact value giving a result of $173.05 instead of $183.59.
This is illustrated more clearly as follows:

If the value at testator's death may be reduced for
any cause, then it is not a fixed and determined value;
it is inaccurate to say the contributed surplus added
$112.50 to each share at its then value. In giving to
each share of stock, old and new, its proportion of value
from the contributed surplus, the same process must be
applied to the earned surplus on hand when that distri-
bution is made. It is just as certain when the stock was
increased, that the value of accumulated surplus to each
share was decreased. Here it would be $210,909 divided
by 20,000 or $10.55.

We would have:

Share value

Contributed surplus................$112.50
Earned surplus ....................  10.55
Capital value .....................  50.00

Intact value ....................$173.05

We arrive at an intact value of $173.05 instead of $183.59 as in the majority opinion. The effect of this is to change still lower the award to the corpus.

However, this correction fails to take into account the fact that the corpus of the estate has been charged with $715,140 out of what must be regarded as a capital loss of $1,835,000 if it is to be treated as a capital loss as to any part. Consequently to be correct, under this view, the majority would have to deduct $111.19 per share additional from the value as computed after the fire. This would result in the complete extinguishment of the value creating a deficit for each share of $40.09. Adding the increase in value resulting from contributed surplus, we would reach an intact value of $71.60; this being less than the value at the date of stock distribution, the corpus of the estate would be entitled to no share in this stock dividend.

It has been pointed out that the San Francisco loss should be treated as an operating loss and deducted from earnings before the life tenant is entitled to a share. Under this view, if the intact value at testator's death is to be preserved, then the distribution of stock dividend should be on the basis of that value. To distribute the 100 per cent stock dividend on this basis there should be added, to the value at death, the additional value through contributed surplus as the majority opinion states, and following the rule of our previous cases and the one adopted by the majority (except as to the time when the intact value is taken), the following statement will show the proportions the life tenant and remainderman should receive.

Share value

Value of stock at testator's death, par ........$ 50.00
Add to this the value of earned surplus as re-
   duced by new shares ....................  46.30
Add to this the value each share, old and new, has
   of contributed surplus ................... 112.50

    Total book value .......................$208.80

Total book value (brought forward) .........$208.80
After the stock dividend, this value was reduced
   to .................................... 152.16

The difference is .......................$ 56.64
or 44 + shares to corpus.