## Neafie's Estate

*Theodore Voorhees*, of *Barnes, Biddle & Myers*, and *Martin V. Bergen*, for exceptants.

*Robert H. Skilton* and *G. Ruhland Rebmann, Jr.*, of *Edmonds, Obermayer & Rebmann*, contra.

STEARNE, J., March 20, 1936.—The exceptions, to an auditor's report of an adjudication of a trustee's account in a trust estate, chiefly involve the apportionment, between income and principal, of the proceeds of a sale both of rights to subscribe for corporate stock and of the stock itself.

In Waterhouse's Estate, 308 Pa. 422, the present chief justice has written a compendium of the principles and decisions respecting the apportionment of income and principal. In applying any given formula, it is well to keep constantly in mind the fundamental principle upon which the Pennsylvania rule is based. It is one of testamentary intent that "income" means all the earnings derived because of the ownership of the stock. Such earnings are due income whether paid in cash or stock, or reflected in accumulated surplus, or otherwise, when the stock is sold or distributed. However, upon equitable principles, the corpus or principal must be preserved intact: Nirdlinger's Estate, 290 Pa. 457.

Out of the veritable forest of facts and complicated figures submitted by the learned auditor and by the able counsel in their excellent briefs, there appear to emerge two major problems, the solution of which will largely settle most of the controverted questions.

The two questions may be stated as follows:

1. Where one of successive life tenants permitted the proceeds of the sale of rights to subscribe for corporate stock to be included in principal, although such proceeds were properly income, and as a result such proceeds were allocated to principal by the orphans' court in adjudications which have since become absolute and incapable of review, upon a subsequent sale of the stock itself what effect has this situation upon the apportionment of such proceeds?

2. Where a trust company depreciates the value of its securities and loans, and upon its books charges such loss to its surplus, is such loss to be regarded as a capital

loss, or a loss in operation chargeable to income, or is it to be equitably divided between principal and income?

In approaching a solution to the first problem our first inquiry is as to the rights of income and principal in the proceeds of rights to subscribe for corporate stock. The formula is well defined in Waterhouse's Estate, supra, pages 429, 430.

"[d] Proceeds arising from the sale of stock rights should be distributed in the same manner and have the same presumptions following as in the sale of stock. They are a species of stock. This is the main question here involved.

"We have held that proceeds from the sale of stock rights, '. . . must be apportioned in the same manner as an extraordinary stock dividend would be; that is, there should be allotted to the corpus of the trust sufficient thereof to maintain unimpaired the intact value of the stock held by it, and the life tenant should receive the balance, because it represents corporate earnings which accumulated after he became entitled to all dividends . . .' But in the case cited we considered the sale of stock rights in reference to intact value and accumulated earnings only, but decided nothing as to stock rights sold at a profit due to the stock's earning power, goodwill, or its intrinsic or speculative value in the market. The benefits resulting from the sale of stock rights under the latter circumstances should be apportioned in the same manner as in the sale of stock. In all cases, in determining the share which the life tenant is to receive based on apportionment, his share is limited to such an amount as is attributable to income or can be fairly included therein. It does not include increases of capital assets not due to earnings, and in the sale of stock rights earnings do not include such items as speculative value, enhanced market value, or the stock's earning power.

"When the trustees sell stock rights, the presumption is that the proceeds derived therefrom represent capital assets of the estate, and the burden of showing the con-

trary rests on those who assert a claim to the fund or part of it."

Page 429: "[c] Where stock that produces income owned by the estate is sold for a price greater than the intact value [as defined and considered above] and such greater price is due to an accumulation of income, the proceeds are apportionable; that is, so much of the proceeds as necessary to preserve the intact value [as defined] goes to the trustees for the corpus, and only so much of the balance that represents income goes to the life tenant.

"But where the greater value is due to the stock's earning power, good will, or its intrinsic, speculative, or enhanced market value, all the proceeds are part of the corpus and belong to the remainderman; the increase is capital gain.

"The presumption is that the proceeds from the sale of stock belong to the corpus of the trust and the burden of proving that they do not rests on the person asserting a claim to them."

Referring to one of the corporations involved as an example, the Fidelity Trust Company, and applying formula (d) of Waterhouse's Estate, supra, to the facts: Shares at death of testator had an intact value of $244.41 per share. The trustee sold rights to subscribe, subsequently issued, at $515.87 per share. At that time the book value of such shares was $687.73. The difference between the book value, $687.73, and the intact value, $244.41, was $443.32, which, according to the undisputed proofs, represented accumulated earnings. It seems undisputed that, because the intact value remained unimpaired, the income should have been allotted $443.32: Jones v. Integrity Trust Co. et al., 292 Pa. 149. However, as the rights sold for $515.87, the excess over $443.32, or $72.55, should have been regarded as a capital gain and allocated to principal.

Despite the right of the life tenant, entitled to the income as above indicated, she chose to permit the entire

proceeds derived from the sale of such rights to subscribe to be included in principal. As a consequence it was so allotted by an auditing judge, and years afterward was so reallotted by a subsequent adjudication. It is conceded that the fund cannot be returned to income. No such claim is made. All agree that the fund must remain in principal.

However, in 1934, the stock itself was sold and the proceeds are before the court for distribution. The life tenant presently entitled to income maintains that, because the rights to subscribe were sold for $515.87 and paid into principal, the effect thereof was to "wipe out" the intact value of the shares, to wit, $244.41. She maintains that, there being no intact value to preserve, she is therefore entitled to all of the proceeds from the sale of the stock itself. Her counsel relies upon Bullitt's Estate, 308 Pa. 413. The auditor negatived such claims and we agree with his conclusion. As we view the present facts, Bullitt's Estate, supra, is contrary to such contention, and is authority for precisely what the auditor ruled.

In Bullitt's Estate, supra, this court, with a dissenting opinion by Van Dusen, J., made an erroneous decision, which was reversed by the Supreme Court. The present opinion writer assumes a full share of responsibility for leading our court into error. In that case a 33⅓ percent stock dividend was declared, attributable to accumulated earnings, which clearly should have gone to income. However, by agreement of all parties such dividend was allotted to principal and was so awarded by an auditing judge. The adjudication thereafter became absolute, and, after a lapse of time, could not be modified. Subsequently an additional stock dividend of 100 percent was declared and a dispute arose over its correct apportionment between income and principal. The error into which this court fell was in concluding that by the agreement to place the 33⅓ percent stock dividend (income) into principal, the parties thereby undertook to

create a new intact value for all shares as of that date: In other words, that, after the 33⅓ percent stock dividend shares were placed in principal at their then book value, the parties intended thereby to place all shares in principal at their then value, and to set up such value as a new intact value. The Supreme Court very properly held that unless the agreement specifically so stated (and it did not) the matter was not res judicata and the correct apportionment should be made.

Chief Justice Kephart, in writing the opinion (see page 421), outlined the formula. It has especial application to the facts of the instant case:

"Intact Value of original 1,150
    shares at $145.9259 a share . . . $167,814.785
Book Value of 383 shares stock
    dividend of 1918 at $218.332 a
    share . . . . . . . . . . . . . . . . . . . . .   83,621.539
Cost of 62 shares purchased . . . . .   14,836.26
 

                              $266,272.584
Add thereto
Contributed surplus per
    share . . . . . . . . . . . . . $20.31
Capital gains per share . .   5.7004
 

                     $26.0104 a share
or 1,595 shares equal . . . . . . . . . .   41,486.588
 

    Total . . . . . . . . . . . . . . . . . . . . $307,759.172."

With 1,595 shares (1,150 original shares and 383 shares stock dividend) a new intact value was therefore established at $192.92 per share. After the 1928 dividend of 100 percent, the 3,190 shares had a book value of $121.09 per share. The total book value of 3,190 shares at $121.09 per share was $386,289.54. The difference, $78,530.37, represented income, and the shares were divided upon that basis.

With Bullitt's Estate, supra, as our guide, we are of opinion that, had the trustees received a stock dividend instead of rights to subscribe (which they sold and converted into cash), then, upon a subsequent sale of the stock, the intact value required to be preserved would have been as follows:

| | |
|---|---|
| Original intact value .............. | $244.41 |
| Stock dividend (assumed merely for illustration) transferred to principal by life tenant at its then value. | 443.32 |
| Accretions (not involved herein) .... | 26.42 |
| Capital gain .................... | 72.55 |
| Total ..................... | $786.70 |

But these transactions did not involve stock dividends. They were actual sales of rights to subscribe and cash was paid into the estate. In our opinion when this cash was received by the trustees, in the absence of agreement by the parties, $443.32 in cash should have been paid to the life tenant as representing earnings and $72.55 should have been paid, in cash, to principal, representing a capital gain. The stock still held would possess its original intact value of $244.41 per share, with accretions of $26.42 per share, a total of $270.83 per share. This intact value is reflected in the books of the corporation. But, as above indicated, the life tenant, instead of receiving her $443.32 per share in cash, permitted it to pass into the corpus of the trust, where it still remains. The $72.55 cash capital gain likewise remains in the corpus. The true intact value per share, which was required to be maintained, was, as above indicated, $270.83, composed of $244.41 original intact value plus conceded accretions of $26.42.

We agree with counsel for the guardian ad litem that the above formula is the true formula in arriving at intact value. In our view, action by the trustees in their account, even though acquiesced in by the parties, which

subsequently becomes absolute, does not change the intact value shown by the corporate records.

However, under any of the views this decision becomes purely academic. Upon the subsequent sale, the stock only realized $269.79 per share, which is less than the intact value under any theory. The proceeds were properly awarded in their entirety to principal. We agree with the auditor in this conclusion.

But independent of any formula of apportionment, when a prior life tenant placed $443.32 per share in cash in the principal of the estate, it went to enhance or increase the trust res. Certainly it was not placed therein for the benefit of the succeeding life tenant, to be collected by her upon a subsequent sale of the stock itself.

Upon the second problem, concerning the method of charging off depreciation: It was said in Baird's Estate, 299 Pa. 39, 44:

"Depreciation is an item which is ordinarily included in book value; if there had been a mistake in charging it off, even if made prior to testator's death, it may in good faith be corrected, whether it inured to the benefit of the life tenants or remaindermen, as the facts happen to warrant."

Also, at page 42:

"Ordinarily the courts will accept the company's manner and method of charging various items as correct when it is done in good faith, and the presumption would be that it is so done; the burden of showing the contrary is on the party asserting it."

In Dickinson's Estate, 285 Pa. 449, a fire insurance company suffered an unusually severe fire loss. The effect of such loss (p. 452) "was not only to exhaust all the undistributed income which had been accumulated after the death of testator, but also to partially deplete that which existed prior thereto, thus reducing the then liquidating value of the stock from $142.61 to $71.09 per share." Upon subsequent extraordinary stock dividends being declared, a dispute arose as to their proper appor-

tionment between income and principal. The remaindermen maintained that the intact value of the stock should be preserved at the value as it existed at the death of testator. The Supreme Court, however, treated the encroachment upon capital as a capital loss and set up the new intact value at $71.09 per share. This appears just to us. The life tenants lost their accumulated earnings, whereas the remaindermen suffered their capital loss.

In the present case the trust company had amassed a considerable surplus out of earnings accrued since testator's death. Upon the stock market crash its securities and loans depreciated greatly in value. As a sound business measure the company depreciated its holdings. This depreciation was charged to surplus. The effect of such action was to exhaust all the accumulated surplus earned after the death of the first life tenant, Mary E. Whitaker. The succeeding life tenant contends that this is a capital loss, which principal should bear or, at least, as in Dickinson's Estate, supra, which should be equitably apportioned between income and principal. The learned auditor, on the facts, refused to allocate any part of this depreciation to principal.

In Dickinson's Estate, supra, the loss was charged first to earnings accumulated since the testator's death. Then, because the loss exceeded that sum, the balance was charged to surplus accumulated before his death. The intact value was thereby impaired. It is a mistake to say that in Dickinson's Estate the loss was equitably apportioned between the respective periods. It was first charged to the life tenant so far as there was an accumulated surplus which might some day belong to him, and only the balance was charged to principal. In the present case the surplus which the life tenant would otherwise be entitled to has been consumed by the depreciation in securities, but there is no depreciation beyond that sum to be taken out of intact value. The learned auditor was therefore correct in refusing to allocate any part of this loss to principal.

As hereinbefore indicated, the above figures used as illustrations pertain to shares of the Fidelity-Philadelphia Trust Company. The trust as originally created in 1898 included shares of the Fidelity Trust Company, which in turn merged with the Philadelphia Trust Company (the trust owning shares in both companies) and which, after final merger, became the Fidelity-Philadelphia Trust Company. The trust also owned shares in the Eighth National Bank, which corporation subsequently merged with the First National Bank and was thereafter known as the First National Bank. The trust also possessed shares in the Lehigh Coal & Navigation Company. All shares were subsequently sold and the proceeds are being allocated. It appears unnecessary, within the confines of this opinion, to narrate again in detail all the particulars of the mergers, stock dividends, sales of rights, etc., in this most complicated situation. It is all set forth in the auditor's report, to which reference may be had upon inquiry. What we have written applies, in whole or in part, in varying circumstances, to all the stock above mentioned.

There remain but few other questions to discuss. The present life tenant contends that upon the respective mergers, for the purpose of the trust, each corporation should be regarded as thereafter still remaining as separate entities. But such claim is without merit. Chauncey's Estate, 303 Pa. 441, rules this situation. When two corporations merge there is a coalescence of physical properties, accounts and assets. Due regard is given the rights of stockholders of each corporation in the joint and coalesced assets. Once these rights are determined, and the new stock equitably distributed to both sets of stockholders, the new stock with its consolidated surplus, as earnings or income, is treated in the same manner as in any other case of apportionment.

Disputes have arisen between the living life tenant and the estates of the preceding deceased life tenants. The auditor, upon clear proof, equitably divided income

among them. The amount awarded to each life tenant depended upon the proofs as to how much of the total income was earned during each successive life estate. This, as we understand Graham's Estate, 296 Pa. 436, is the correct rule. True it is that where there is no proof of earnings in the respective lives of the preceding life tenants the life tenant presently entitled takes all the income. But here there was proof submitted in sufficient strength to overcome this presumption and to justify the equitable apportionment made by the auditor. It is no answer to say that the estate of one of the life tenants did not claim it. The orphans' court is a court of equity and, whether claimed or not, awards a distributive share to the proper party. If he does not choose to accept such award, then of course it may be thereafter awarded to the other parties in interest. Neither has the statute of limitations any relation to this question, and such contention merits no further discussion.

We have reviewed the auditor's findings of fact and conclusions of law and concur in the distribution which he recommends. The exception of John F. E. Hipple, guardian ad litem, etc., is sustained, but all other exceptions of all parties are dismissed. We have approved the decree which the auditor has submitted.