## Dempwolf's Estate

*Walter B. Hays,* for accountant.
*Palmer C. Bortner,* as guardian ad litem.

GROSS, P. J., July 1, 1946.—By filing specific exceptions to the personalty income account, all of the items making up the above gains [from sales of unimproved real estate] have been excepted to by the trustee ad litem on the grounds that none of said items constitute income of personalty, but do constitute principal, belong to the principal personalty account and should have been included therein.

Accountant contends that under the fourth item of the will testator bequeaths to his four children "in equal shares all the rents, issues, profits and income of my entire estate during their natural lives" and that these gains are "profits" and that testator intended that they should be distributed as income.

The Uniform Principal and Income Act of May 3, 1945, P. L. 416, sec. 2, recognizes the right of testator or creator of a trust to direct the manner of ascertainment of income and principal and the apportionment of receipts and expenses, or grant discretion to the trustee or other person to do so, and such provision

and direction, where not otherwise contrary to law, shall control notwithstanding the act; and in section 17 of the act fixing its effective date as May 3, 1945, it is provided that the act shall apply to all estates of tenants or remaindermen and to all wills, trust agreements and trust relations theretofore or thereafter made or created, provided that the provisions of the act shall not apply to receipts and expenses received or paid prior to the effective date of this act.

The extent to which the Uniform Principal and Income Act is applicable would seem to be unimportant because, if testator intended to include the gains (profits) of $59,338.84 in question in his gift to the life tenants under the word "profits" as used by him, then these gains would belong to them, but if, by his gift of "rents, issues, profits and income", he only intended to mean "income" in the strict sense of the word, then these gains would belong to principal.

Many quarrels and disputes have arisen between life tenants and remaindermen as to which one was entitled to enjoy the enhancement in the value of the assets of a trust and have left us a legacy of voluminous rules and cases concerning the respective rights of each. Historically, many of these rules were apparently created when land was predominantly the common denominator and nature itself seemed to make the division, and with modern investments there has resulted a tendency to adopt the analogy of real property.

It is indeed difficult to give a good general definition of income or profits. Broadly speaking, a draftsman can use either of these words to mean just what he wants them to mean, provided, however, that he takes the caution or care to make his meaning clear. In the interpretation of documents creating trusts and using orthodox legal terminology, what is the meaning of "profits" when used as a term therein, or when used in conjunction with other similar terms and combinations of them? Does its inclusion entitle the beneficiary

to enhancement in value or added increment realized on the sale of trust assets, or is it merely descriptive of income? Are "profits" income or corpus? Are "profits" really "a profit"?

A trustee with power of sale, but no duty to sell, may dispose of trust property and make a profit on the sale when the sale price is compared with the inventory or cost price of a property. Under the prevailing view, 4 Bogert, Trusts and Trustees, §823, such a profit is quite universally held to go to the capital of the trust fund. If there is no indication of an intent on the part of testator that it shall go to the life tenant and, even if testator directs that all "profits" shall be paid to the life tenant, he will usually be deemed to have intended that all profits in the nature of rents, interest, dividends and other income shall go to the life tenant: A. L. I. Restatement, Trusts, §233, at page 691; and not that accretions in the nature of realized advancements in the price of capital of the trust shall be paid to the life tenant: Kemble's Estate, 201 Pa. 523; Neel's Estate (No. 2), 207 Pa. 446.

In 13 Temple Law Quarterly 239, the author states:

"Where the draftsman of an instrument has in the instrument given considerable demonstration of his familiarity with the ordinary words of art, such words should be given their technical meaning. The precise force or weight of the technical meaning should be given the term 'profits', when so used, whether it stand completely by itself, or in association with the terms 'rents', 'issues', 'dividends', 'interest', 'income', 'increase', or combination of such terms, or an interchangeable usage thereof. The use of the words 'income and profits' is only due to the lawyer-like fondness for using several words where one is sufficient. An additional indication of the correctness of such conclusions may be found in the application of the familar maxim *noscitur a sociis* (it is known by its associates).

This useful canon of interpretation aids in ascertaining the meaning of a doubtful word by reference to the meaning of words associated with it."

So far as our own research of the authorities has extended, we have not been able to find a complete and satisfactory definition of the word "profits" as applied in a case of this kind. The question never seems to have been before the Pennsylvania Supreme Court. The meaning of the word "profits" in this connection has been very ably discussed and stated by the late Judge Gest in Leech's Estate, 4 D. & C. 1, in which he collates and exhaustively comments on all the cases in Pennsylvania dealing with this identical subject and from which we conclude that the Pennsylvania view would be such as would place us with the general weight of authority hereinbefore stated.

As a rule, testator does not intend that his trustees shall indulge in speculation with the investments of the trust res and, therefore, it requires strong evidence to show that any enhancement in the value of the trust assets is not to be added to and become a part of the principal of the fund: In re Eger's Will, 139 Misc. Rep. 59, 247 N. Y. Supp. 527, and In the Matter of Final Accounting of Gerry, 103 N. Y. 445.

We believe the rulings of the Supreme Court as laid down in Graham's Estate, 198 Pa. 216; Kemble's Estate, 201 Pa. 523; Neel's Estate, 207 Pa. 446; Nirdlinger's Estate, 290 Pa. 457; Waterhouse's Estate, 308 Pa. 422, and Lewis Estate, 351 Pa. 576, constitute the weight of authority in this state, and support the conclusion that "profits", that is, the enhanced value of the assets in this trust, belong to principal and not to income.

It is a fundamental principle that the intact value of the corpus of a trust must be preserved. In the case where the trustee acquired the shares of stock from testator their book value is prima facie their intact

value: Waterhouse's Estate, supra; Baird's Estate, 299 Pa. 39. See aso Dickinson's Estate, 285 Pa. 449, Thompson's Estate, 262 Pa. 278, and Flinn's Estate, 310 Pa. 206. The authorities just cited would specifically apply to class 1 and class 3 of the gains or profits in this case. If, on the other hand, the trustee purchased the shares, the cases indicate that the purchase price and not the book value at the date of the purchase is the intact value: Hostetter's Trust, 319 Pa. 572; Jones v. Integrity Trust Co. et al., 292 Pa. 149. This would specifically apply to class 2 of gains or profits in this case.

The following quotation from Lewis Estate, supra, at page 580, we think is quite relevant to the instant case:

"Where a life tenant claims a part of the proceeds of a liquidation he has the burden of proof to show that any part of the profit thereby received was due to an accumulation of undistributed earnings. The presumption is that all of such proceeds of liquidation belongs to principal. The life tenant must show affirmatively that some part of it was due solely to accumulated earnings. We said, in Nirdlinger's Estate, 290 Pa. 457, 475, 139 A. 200: 'The rise in the value of trust investments, where such rise has not been shown by one claiming as a life tenant to be due to undistributed earnings, has always been properly regarded, like the rise in the value of lands held in trust, to be an accretion of the principal, and, therefore, belongs to the remainderman.' In McKeown's Estate, 263 Pa. 78, 86-7, 106 A. 189, this Court held that 'When a corporation is liquidated, those entitled to the income of the trust are to be awarded so much of the sums received for the stock as they show was income accruing after their right to income began, and the balance goes to principal; and this is so although the course pursued takes the form of a sale of the stock.' It is also well estab-

lished that the proceeds from the sale of stock are presumed to belong to the corpus of the trust: Waterhouse's Estate, 308 Pa. 422, 162 A. 295."

Counsel for accountant has cited Park's Estate, 173 Pa. 190, and Quay's Estate, 253 Pa. 80, as authority for holding that these gains or profits are income, and from our study of these two cases we agree with the criticisms expressed concerning both of them in subsequent decisions of our courts that they are hard to distinguish from the more recent cases. Our own criticism of these two cases is that they are authority only for the particular facts in each of those cases. In the Parks case there was a direction to invest and reinvest, and in the Quay case there was a conversion of the assets by testator. We find neither of these elements in the instant case and, therefore, they may be regarded as decisive distinguishing characteristics from the later decisions and from the instant case, in which there is no conversion of the trust assets.

Further discussion seems to be unnecessary, except to say that the losses sustained in the conversion of the trust assets as shown on pages 22, 23, 24 and 26 of the account, totaling $2,068.89, which were included in the personalty income account as credits, must also be regarded as proper items of credit in the principal personalty account.

The account will be hereinafter adjusted in accordance with our foregoing conclusions.

Exception no. 1 is dismissed as containing no matter of substance, and exceptions nos. 2 to 52, inclusive, are sustained.

In view of our former rulings on the subject of "profits" and income, and in harmony with Opperman's Estate, No. 1, 319 Pa. 455, that courts will tend to favor the life beneficiaries, at least where they are the widow and children of the creator of the trust, we feel that justice and equity requires us to make some apportionment of the proceeds of the sale of

unproductive real estate between principal and income.

Decedent, at the time of his death, owned a tract of unimproved and unproductive land in the amount of 11.5 acres. On the above tract of land accountant had paid taxes accruing since the death of decedent on April 23, 1935, up to and including the year 1942, in the total sum of $331.93. After 1942 said tract became productive.

On September 14, 1945, accountant sold 6.776 acres or 59 percent of the entire tract and received therefor the sum of $7,325. The taxes paid as aforesaid allocable to that part sold would be 59 percent of the sum of $331.93, or the sum of $195.83. Accountant asks credit in the principal realty account for capital gains tax in the sum of $1,193.53, which includes the capital gains tax on the first unimproved lots sold as a unit and hereinafter referred to. The price received from the sale of the 6.776 acres is 71 percent of the total price received for said 6.776 acres and the 16 lots aforesaid, and the capital gains tax on the 6.776 acres would be 71 percent of $1,193.53, or the total sum of $847.41.

In order to make the matter clear, we submit the following tabulation of what we have already said:

September 14, 1945, sold 6.776 acres for .. $7,325.00

Carrying charges for period:

| | | |
|---|---|---|
| Taxes on 11.5 acres ......... | $331.92 | |
| Taxes on 6.776 acres—59 percent of $331.93 ........... | 195.83 | |
| Expenses incurred in disposition: | | |
| Accountant's compensation, 3 percent ................ | 219.75 | |
| Pro rata share of capital gains tax—71 percent of $1,191.53 | 847.41 | |
| | | 1,262.90 |
| Net proceeds of sale ................ | | $6,062.01 |

Decedent also owned, at the time of his death, 73 unimproved and unproductive lots of ground located in the 12th ward of the City of York, Pa. On October 16, 1945, accountant sold 16 of these lots and received therefor the total sum of $3,000. The taxes paid on the 73 lots to the end of 1945 amounted to the total sum of $2,774.56, or an average tax per lot of $38.01, and 16 lots the total of sum of $608.16. Accountant's compensation on the sale of these lots of three percent is the sum of $90, and the pro rata share of the total capital gains tax of $1,193.53 on these 16 lots arrived at in the same manner as in the former case would be 29 percent of $1,193.53, or the sum of $346.12.

In order to make the matter clear, we submit the following tabulation with respect to the sale of these 16 lots:

October 16, 1945, sold 16 lots for . . . . . . . .   $3,000.00
Carrying charge for period:
    Tax on 73 lots . . . . . .$2,774.56
    Average tax per lot . .　　16.01
               ———————
    Total taxes on 16 lots . . . . . . .   $608.16
Expenses incurred in disposition:
    Accountant's compensation at 3
       percent . . . . . . . . . . . . . . . .　　90.00
    Pro rata share of tax on capi-
       tal gain — 29 percent of
       $1,193.53 . . . . . . . . . . . . . .　　346.12
                        ———————   1,044.28
                                          ———————

Net proceeds of sale . . . . . . . . . . . . . . . .   $1,955.72

On February 23, 1946, accountant sold 16 additional lots of the said 73 lots for the total price of $3,189.16. The average tax per lot for the period 1936 to 1945, inclusive, is $38.01. The tax on the 16 lots for the same

period is the sum of $608.16, to which we add 1946 city tax, being 16/57 of the total city tax of $70.50, or the sum of $19.79. Accountant's commissions at three percent are the sum of $95.67.

In order to make the matter clear, we submit the following tabulation of what we have said concerning the immediate 16 lots above referred to:

February 23, 1946, sold 16 lots for ...... $3,189.16

Average tax per lot for period

1936-1945—$38.01, or total tax

on 16 lots for the same period . $608.16

Add 16/57 of $70.50, the 1946

city tax ................... 19.79

$627.95

Accountant's compensation at 3

percent ................... 95.67

723.62

Net proceeds of sale ................ $2,465.54

In the immediate above calculation we have not given any consideration to capital gains tax on the sale of these 16 lots and for the reason that they were sold in the year 1946, and it is anticipated that the capital gains tax will not be settled until after January 1, 1947, and it therefore appears that a readjustment of the apportionment of these last 16 lots will have to be made as and when the said capital gains tax is paid.

In the apportionment between principal and income of the moneys received from the sale of the foregoing unproductive real estate, we will count the term during which income would accrue to the life beneficiaries as of one year after the death of testator.

Our difficulty in allotting the proceeds and carrying charges of this unproductive real estate which has been sold arises from the precise method or formula

to be followed in making such allocation or apportionment. Nirdlinger's Estate, No. 2, 327 Pa. 171, and Nirdlinger's Estate, 331 Pa. 135, as pointed out in Crozer Estate, 346 Pa. 446, and Levy's Estate, 333 Pa. 440, involved salvage operations, and the rule therein followed may or may not be applicable to an allocation or apportionment of the kind involved in the instant case.

In Levy's Estate, supra, p. 442, the Supreme Court laid down the general rule of equity in matters of this kind, as follows:

"While it is true that, in times past, no contention was made, or if made was not entertained, that carrying charges of unproductive real estate should be paid out of principal, and it was assumed they were payable out of income, a new day has brought about sound reasons for a departure from this practice, and now we are of opinion that in all cases they should not be charged to and be paid by income, but that whether to be so paid, or to be paid out of principal, or divided between the two, should be determined by considering the equities in each case. The determination of the question is one for the exercise of a sound discretion by the court of first instance and we will review only where there has been a palpable abuse of discretion. The difficulties anticipated in carrying out this program are we think more fanciful than real. The matter can be determined when accounts are filed, embodying the proceeds of the sale of unproductive real estate, or, if greater celerity of disposition is required, the matter can be specially brought before the court."

And in Crozer Estate, supra, p. 449, in further explanation of the rule just quoted from Levy's Estate, the Supreme Court said:

". . . an auditing judge has the discretion, considering the equities of the case, to determine in what proportions the life tenants and the remaindermen

shall bear the carrying charges. Relief to life tenants may be given in advance of sale. Each property, however, must be separately regarded and treated. Consideration may not be given to the real estate as a whole. The exercise of discretion must be upon the facts and circumstances relating to each separate piece of real estate. There is nothing in the record which discloses how, or in what circumstances, or with respect to which properties, the apportionment of these proceeds was made. Appellant is entitled to a supporting record."

Without suggesting that the Uniform Principal and Income Act of May 3, 1945, is or is not applicable to this apportionment, it is interesting to note that section 11 of said act suggests what we would consider an equitable formula to be followed in making this apportionment. The act indicates that the difference between the net proceeds and the amount which, at five percent per annum simple interest during the period of delay, would have produced the net proceeds at the time of the change, belongs to income. In other words, principal is the discounted value of the net proceeds at five percent simple interest for the period of delay. The net proceeds are determined by deducting from the gross proceeds the cost of sale and the advances made from principal for carrying charges during the unproductive period. From the amount allotted to income under this formula, there is, of course, deducted any income paid to the tenant on the value of his use during the period of delay. No interest is allowed life tenant on advances from principal. See Nirdlinger's Estate No. 2, 327 Pa. 171.

It has been held in Dwight's Estate, 56 D. & C. 160, that the Uniform Principal and Income Act does not apply where accountant has the discretion to refuse to exercise his power to sell as he seems to have had in the instant case.

We have only alluded to the Uniform Principal and Income Act as to what seems to contain a just and equitable formula. The formula also suggested by said act is in effect substantially the same as that to be found in section 241 of A. L. I. Restatement, Trusts, which section has also been held in Mark's Estate, 38 D. & C. 489, as not acceptable in Pennsylvania. There are several other lower court decisions to the same effect.

After due consideration of the facts and application of the law hereinbefore cited, we have concluded that the following formula would work both justice and equity to the beneficiaries and to the remaindermen, to wit:

$a$ = time during which real estate was unproductive since one year after death of testator to date of sale.

$b$ = yearly rate of return at five percent.

$c$ = net proceeds of sale.

$x$ = amount to be treated as principal.

$$x \text{ plus } a5x = c$$

or

$$x = \frac{c}{1 \text{ plus } a5}$$

Applying the above formula to the sale of the 6.776 acres for the period of six years and five months, we find that

$$X = \frac{\$6,062.01}{1.320833}$$

or the sum of $4,589.53, which must be treated as principal, and the difference between that amount and $6,062.01, or the sum of $1,472.48, is treated as income.

Applying the above formula to the sale of the first 16 lots of ground for the period of nine years and six months, we find that

$$x = \frac{\$1,955.72}{1.475}$$

or the sum of

$1,325.91 which must be treated as principal, and the difference between that amount and $1,955.72, or the sum of $629.81, is treated as income.

Applying the above formula to the sale of the second 16 lots for the period of nine years and ten months, we find that $x = \dfrac{\$2,465.54}{1.491666}$ or the sum of $1,652.80 which must be treated as principal, and the difference between that amount and $2,465.54, or the sum of $812.66, is treated as income.

The foregoing apportionments result in allocating to income the total sum of $2,914.95 and the readjustment of the account will show this sum transferred from the principal realty account to the income realty account.

The purpose of the filing of this account is to permit accountant to resign as trustee.

[Four pages of adjudication devoted to the restatement of the account and the schedule of distribution are omitted.]

And now, to wit, July 1, 1946, it is hereby ordered, adjudged and decreed that the second and final account of Charles H. Dempwolf, Jr., executor and trustee (virtute officii) under the will of Charles H. Dempwolf, late of the City of York, York County, Pa., deceased, as herein adjusted, is confirmed absolutely; and it is further ordered, adjudged and decreed that said accountant pay the distributions to the persons entitled to receive the same and in manner and form as set forth in the foregoing schedule of distribution; and it is further ordered that said accountant make, execute and deliver all assignments, transfers and other instruments in writing necessary to effect a legal delivery of the assets awarded in kind.

This decree is entered nisi and in the absence of exceptions filed thereto within 10 days from the date hereof the same shall become final, as of course.